**P. STOLZ FAMILY PARTNERSHIP L.P., on behalf of itself and others similarly situated, Plaintiff–Counter–Defendant–Appellant,**

v.

**Steven B. DAUM, Paula B. Daum, Philip Spies, and Smart World Technologies, LLC, Defendant–Counter–Claimant–Appellee.**

**Docket No. 02–7680.**

United States Court of Appeals, Second Circuit.

Argued: March 4, 2003.

Decided: Jan. 12, 2004.

Paul D. Wexler, Bragar Wexler Eagel & Morgenstern, LLP, New York, NY, for Plaintiff–Counter–Defendant–Appellant.

Barry S. Pollack, Donnelly Controy & Gelhaar, LLP, Boston, MA, for Defendant–Appellee.

Giovanni Prezioso, General Counsel, Jacob H. Stillman, Solicitor, Allan A. Capute, Special Counsel to the Solicitor, for Amicus Curiae S.E.C., Washington, D.C.

Before: CALABRESI, SACK, and CUDAHY,* Circuit Judges.

Judge CALABRESI concurs in a separate opinion.

CUDAHY, Circuit Judge.

Smart World Technologies (Smart World) was one of many technology companies that did not survive the bursting of the technology bubble during 2000. Its business was free Internet access. At some point during its existence, Smart World began offering and selling "membership interests" in the company through a written prospectus. The P. Stolz Family Partnership (Stolz) purchased 31,250 of these membership units for a total of $250,000 with a Subscription Agreement signed on February 17, 2000. The sale was effective with the issuance of a certificate of membership to Stolz on April 28, 2000. Thereafter, Smart World's business collapsed, and it filed for bankruptcy in June of 2000.[1]

Stolz filed its original complaint against Smart World and three of its officers (collectively, also, Smart World) in this putative class action in February 2001 and its Amended Complaint on June 5, 2001. Stolz alleged that the offer and sale of the membership interests violated the Securities Act of 1933, 15 U.S.C. § 77a et seq. (Securities Act or Act). The Amended Complaint contained two counts. Count I alleged a violation of § 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1), claiming that Smart World and three of its officers made a public offering of unregistered securities in violation of § 5 of the Securities Act, 15 U.S.C. § 77e. Count II of the Amended Complaint alleged that the defendants made material misrepresentations in connection with a prospectus for the public offering of securities in violation of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

On a motion to dismiss by Smart World, the district court dismissed Count II in its entirety and dismissed Count I as to Philip Spies, the Smart World CFO. *Stolz I*, 166 F.Supp.2d at 875. Count II was dismissed under the "bespeaks caution" doctrine. The court found that the prospectus of Smart World contained sufficient cautionary language concerning possible risks that an investor could not be misled by the alleged misrepresentations. As to Count I, the court dismissed the claim against Spies because Spies was not a "control person" under § 15 of the Securities Act, 15 U.S.C. § 77o.

Stolz subsequently amended its complaint again, filing the Second Amended Complaint on November 19, 2001. The Second Amended Complaint only included Count I, and did not replead Count II. In the Second Amended Complaint, Smart World amended the allegations of the factual background. While it had previously alleged that "[b]eginning in or about November, 1999, Smart World engaged in a 'public offering,'" now the Second Amended Complaint alleged in paragraph 16 that "[b]eginning in or about July, 1997 and continuously through the bankruptcy filing ... Smart World engaged in a 'public of-

---

* The Honorable Richard D. Cudahy, Circuit Court Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The bankruptcy court lifted the automatic stay for the purpose of allowing Smart World to be named a defendant in the present action. *See P. Stolz Family Partnership, LP v. Daum,* 166 F.Supp.2d 871, 873 n. 1 (S.D.N.Y. 2001) (*Stolz I* ).

fering.'" On a new motion by Smart World, the district court dismissed Stolz's Second Amended Complaint in its entirety. *P. Stolz Family Partnership, LP v. Daum*, 204 F.Supp.2d 693 (S.D.N.Y.2002) (*Stolz II*). Claims under § 12(a)(1) of the Securities Act face a statute of repose that states that "[i]n no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public...." 15 U.S.C. § 77m. The original complaint was filed on February 20, 2001. The district court found that this filing was more than three years after the membership interests were "bona fide offered to the public," and thus the claim was barred.

## I.

We review *de novo* the district court's dismissal under Rule 12(b)(6), accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor. *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir.2003)

### A. § 12(a)(2) claim

#### 1. Waiver

■ As a preliminary issue, we must address Smart World's argument that Stolz has waived its § 12(a)(2) claims by not repleading them in the Second Amended Complaint. But this is not our rule. We will not require a party, in an amended complaint, to replead a dismissed claim in order to preserve the right to appeal the dismissal when the court has not granted leave to amend.[2] Such a formalistic requirement serves no valid purpose. In this respect, we join most other circuits. *See Young v. City of Mt. Ranier*, 238 F.3d 567, 572 (4th Cir.2001) (collecting cases); *see also* 3 Moore's Federal Practice, 3d ed. § 15.17[4] ("In this situation [where a claim has been dismissed without leave to amend] it would be pointless to require the plaintiff to replead the dismissed claim and plaintiff's counsel would be forced to bear the risk of sanctions to preserve the client's right to appeal."). Stolz's § 12(a)(2) claim is properly before us on appeal.

#### 2. Allegations of Historical or Present Fact

■ A defendant may not be liable under § 12(a)(2) for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security. *See Halperin v. EBanker Usa.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986) ("We are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.'"). This is the "bespeaks caution" doctrine under which the district court dismissed Stolz's § 12(a)(2) claim.

■ Although it does not appear that this circuit has ruled specifically on this issue, other circuits have expressly limited the application of the "bespeaks caution" doctrine to forward-looking, prospective representations, but they have noted that the misrepresentation of present or histor-

---

**2.** We indicate no views on the appropriate standard for cases where the district court has granted leave to amend a dismissed claim.

ical facts cannot be cured by cautionary language.[3] *See, e.g., EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 874 (3d Cir.2000) ("By its terms, the 'bespeaks caution' doctrine ... is directed only to forward-looking statements."). District courts within this circuit have recognized this limitation. *In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001) (noting that the "bespeaks caution" doctrine applies "to forward-looking statements *only,* and not to material omissions or misstatements of historical fact.") (emphasis in original). This is a reasonable limitation on the "bespeaks caution" doctrine and we adopt it here. The cautionary language associated with the "bespeaks caution" doctrine is aimed at warning investors that bad things may come to pass—in dealing with the contingent or unforeseen future. Historical or present fact—knowledge within the grasp of the offeror—is a different matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.

▇ Additionally, the cautionary language must be examined in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation. *See Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir.1998) ("The cautionary language, however, must relate directly to that by which the plaintiffs claim to have been misled.").

▇ Stolz's allegations centered on oral representations made by Smart World that it had hired an investment bank to do a $30 million financing and to subsequently take Smart World public with an initial public offering (IPO) that would raise $50 to $100 million. In its Amended Complaint, Stolz laid out relevant parts of the factual background for its § 12(a)(2) allegations as follows:

> SmartWorld [orally] represented to prospective investors ... that ... it had entered into an agreement with an investment bank to do a financing which would raise $30 million ... and that it had made arrangements with an investment banking firm to file an [IPO]. ...

Amended Complaint at ¶¶ 18, 33 (App. at 13, 16). The specific allegations of a violation of § 12(a)(2) followed thereafter:

> At no time prior to plaintiff's purchase of the [membership interests] did Smart World disclose that the investment bank it had retained had failed to raise any money for the company, that no initial public offering was being planned, that the projections of sales and revenues it was relying upon were totally without foundation, or that the Company was essentially insolvent and was supporting itself through continued sales of membership interests rather than from revenues from ongoing business operations. Thus, Smart World made untrue statements of a material fact and/or omitted to state material facts necessary to make the statements made not misleading in violation of § 12(a)(2) of the Securities Act.

Amended Complaint at ¶ 34 (App. at 16).

Even taking all facts alleged as true and examining this paragraph in the light most favorable to Stolz, we can find only one allegation that can be characterized as involving present or historical fact, and as

---

**3.** Because the "bespeaks caution" doctrine is often defined with respect to forward-looking statements, elaborating such a distinction may be unnecessary. But in the interests of clarity we do so.

98

thus insulated altogether from the "bespeaks caution" doctrine: "that no initial public offering was being planned." This statement can be characterized as alleging that there never existed the foundational agreement even to try to take Smart World public. While it should take very little discovery to investigate the viability of this allegation, it was improperly dismissed at this early stage of litigation.

■ The remaining allegations in ¶ 34 are prospective in nature, and the "bespeaks caution" doctrine is available. Therefore, we turn next to Smart World's cautionary language.[4] And as in so many documents of this kind, there is a significant amount of it. In its prospectus for the membership interests, for example:

> To expand our network, *we may need additional capital, which we may not be able to obtain* .... If we do not receive additional capital, we will need to seek alternative sources of financing .... If alternative sources of financing are required, but are insufficient or unavailable, we will have to modify our ... plans, which may ... adversely affect our growth.

Prospectus at ¶ 3 (App. at 311) (emphasis added). And in the Subscription Agreement:

> (b) *No assurance can be given, nor has any been given, that any of the Financing transactions or the Expansion will be consummated.* Even if consummated, no assurance can be given that the Expansion will be successful or the financing will generate capital sufficient to fund the Expansion, the needs of the Company in connection therewith, or the operations of the Company on a going forward basis. It is understood that if the Financing and the Expansion are not successful, there likely will be no funds available to refund any of the money invested in the Company by the undersigned. This is a speculative investment which could result in the loss of the investment in its entirety.
>
> (c) *There is no present public market for the Units and it is unlikely that a public market for the Units will develop in the future.* No public market will develop if either the Financing or the Expansion is not successfully completed.
>
> (d) Due to the absence of a public market for the Units: (I) the undersigned will not be able to liquidate this investment in the event of an unexpected need for cash; (ii) transferability of the Units is extremely limited; and (iii) in the event of a disposition of the Units, the undersigned could sustain a loss.

Subscription Agreement, § 2(b)-(d) (App. at 327) (emphasis added). This language sufficiently cautions prospective investors that future financing was tenuous. Any oral representations concerning a sought-after $30 million or a future IPO (as opposed to the existence of an agreement to try to plan an IPO) were neutralized by these cautionary statements. Other than the allegation that no agreement with the investment bank concerning the IPO existed, Stolz's remaining § 12(a)(2) claims were properly dismissed.

### B. § 12(a)(1) claim

■ The interpretation of § 13's three-year statute of repose is a question of statutory interpretation that this court reviews de novo. *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 107 (2d Cir.2001). In determining whether Stolz's § 12(a)(1) claim is time-barred, we must

---

4. The Prospectus and Subscription Agreement were incorporated by reference in the Amended Complaint, at ¶ 19 (App. at 13), and are available for consideration on a motion to dismiss.

address two issues: 1) what is a "bona fide offer" and 2) at what point during the bona fide offer does the repose period begin?

### 1. What is a bona fide offer?

■ Stolz argues that the "bona fide offer" that triggers the repose period is the effective date of the security's registration statement. It certainly is true that, in the case of registered securities, the date of registration has been treated as the date that starts the running of the repose period (most relevantly in the context of § 11 claims). *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir.1992); *Griffin v. PaineWebber Inc.*, 84 F.Supp.2d 508, 512 (S.D.N.Y.2000); *Morse v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 619, 622–24 (S.D.N.Y.1977). Unlike § 11 claims, § 12(a)(1) claims often deal with claims that a stock was not registered at all, so this test is a non-starter. We believe, however, that the registration is merely the manifestation of the underlying test: the genuineness of the offer to the public. The relevant question for § 13 is when was the stock really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering. Obviously, such an interpretation makes considerable sense in the context of unregistered securities.

In contrast, adopting Stolz's argument means, as appellants readily acknowledge, that unregistered securities would never be subject to the three-year repose period because, by definition, they would never be registered. This would be an absurd result, and Stolz's arguments to the contrary are unconvincing. Additionally, the majority of courts and commentators to consider this issue agree with us. *See, e.g., Kubik v. Goldfield*, 479 F.2d 472, 475 (3d Cir. 1973) (finding that stock is bona fide offered when genuinely offered to public, even if unregistered, but in context of deal-er exemption under 15 USC § 77d); *Sla-gell v. Bontrager*, 616 F.Supp. 634, 636–37 (W.D.Pa.1985) (finding in dictum that bona fide means genuinely offered); *Sowell v. Butcher & Singer, Inc.*, No. 84–0714, 1987 WL 10712, at *8 (E.D.Pa. May 13, 1987) (finding "bona fide" in § 13 is to be interpreted in a fashion similar to dealer exemption and means "genuine"); *but see Bradford v. Moench*, 809 F.Supp. 1473, 1486–87 (D.Utah 1992) (finding that unregistered securities could never be "bona fide offered to the public"). In interpreting another part of the Act, Professor Loss, co-author of an authoritative treatise on securities regulation, also interpreted bona fide to mean genuine, and not legal, in the context of the dealer exemption in 15 U.S.C. § 77d:

> The phrase bona fide certainly does not refer to a legal offering. It was obviously copied from the original § 4(1), where the single clause that in 1954 became Clauses (A) and (B) excepted "transactions within one year after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter." The "bona fide" phrase was the drafter's device for ensuring, as now provided specifically in Clause (B), that the prospectus-delivery requirement should apply for an entire year from the date of the *first genuine rather than simulated offering to the public.* In other words, the emphasis was on "public" and not "first."

Louis Loss & Joel Seligman, *Securities Regulation* § 2–B–6, n.285 (3d ed.1996) (emphasis added). Stolz presents no good reason why "bona fide" should not have the same meaning in § 13. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (ruling that identical terms in different parts of 1933 Act are intended to have the same meaning—in context of term "prospectus").

Stolz's reliance on the dictum in *Finkel* is misplaced. In *Finkel,* we noted that the plaintiffs in that case conceded that "ordinarily, a security is 'bona fide offered to the public' at the effective date of the registration statement." *Finkel,* 962 F.2d at 173. Thus, Stolz argues that the three-year prong of the repose period does not begin to run absent a duly-filed registration statement. The claim at issue in *Finkel,* however, was a § 12(a)(2) claim, not a § 12(a)(1) claim; the issue in question was how to define the word "sale" in § 13; and the securities in question were registered, not unregistered. *Finkel 's* aside on an unrelated issue is not persuasive.[5]

2. *When during the bona fide offer does § 13's clock begin to run?*

■ The more difficult issue is whether the three-year repose period begins when the security is *first* bona fide offered to the public (the "first-offered test"), or *last* bona fide offered to the public (the "last-offered test"). We raise this issue *nostra sponte.* Because of the novelty and importance of this issue, we requested and received briefing from the Securities Exchange Commission (SEC) as *amicus curiae.*

This is a difficult issue because the language of § 13 provides us with little direction. There are no modifiers attached to "bona fide offered," and the sentence in which the phrase is embedded is equally susceptible to being read as either "first bona fide offered" or "last bona fide offered."

However, the *vast* majority of courts to consider § 13 have impliedly or expressly found that the three-year period begins when the security is *first* bona fide offered. *See, e.g., Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1168 (7th Cir.1995) (noting in dictum that "[s]ection 13 of the '33 Act ... gives investors the lesser of three years from the time the security was first 'bona fide offered to the public' or one year from the time the fraud was discovered"); *Hanson v. Johnson,* 2003 WL 21639194, at *5 (D.Minn. June 30, 2003) (adopting first-offered test for unregistered securities and collecting cases); *Ballenger v. Applied Digital Solutions, Inc.,* 189 F.Supp.2d 196, 199 (D.Del.2002) ("That is, the action must be brought both within one year of the alleged violation and within three years of the time the security was first bona fide offered to the public."); *In re NBW Commercial Paper Litig.,* 826 F.Supp. 1448, 1473 (D.D.C.1992) (adopting first-offered test and explaining that the three year period is a trap for the unwary investor and puts the risk on the investor to discover the date of offering); *In re*

---

**5.** Similarly, the *Bradford* court, while directly addressing the issue in question here, is equally unpersuasive. In *Bradford,* the district court focused on what it called the "ordinary meaning" of the words "bona fide" which it found to be "in good faith, without fraud or deception." *Bradford,* 809 F.Supp. at 1487 (internal quotations omitted). From this "ordinary meaning," the court then imported definitions of "good faith" from other cases that used the words to mean in compliance with the "requirements of the law." *Id.* Therefore, found the *Bradford* court, the words "bona fide" imply that the securities were offered in compliance with the law, and

securities that are unregistered in violation of § 5 of the Act can never be bona fide offered. This interpretation, however, would mean that the three-year repose period would never be applied to § 12(a)(1), which prohibits the sale of unregistered securities. There is no indication that Congress intended such a result. Moreover, the ordinary meaning of "bona fide" includes "genuine." *See* Blacks Law Dictionary (7th ed. 1999) ("Bona Fide: 1. Made in good faith; without fraud or deceit. 2. Sincere; genuine."). In any case, the views of the Utah district court are not controlling here.

*Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 483 (S.D.N.Y.1989) ("Courts have determined the 'bona fide' offering date of an unregistered security to be the date the security was first quoted by a dealer in the pink sheets, which is the date on which trading in the security commenced."); *Zola v. Gordon*, 685 F.Supp. 354, 360 (S.D.N.Y.1988) (adopting first-offered test for 12(a)(1) claims based on weight of authority); *Dendinger v. First Nat'l Corp.*, No. 87–4611, 1989 WL 85070, at *8 (E.D.La. July 27, 1989) (same); *Stone v. Fossil Oil & Gas*, 657 F.Supp. 1449, 1456 (D.N.M.1987) (stating that claim must be filed "within three years after the securities were initially bona fide offered to the public"); *Sowell*, 1987 WL 10712, at *8 (accepting first-offered test without discussion); *Waterman v. Alta Verde Indus., Inc.*, 643 F.Supp. 797, 808 (E.D.N.C.1986) (adopting first-offered test based on weight of authority); *In re National Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F.Supp. 1138, 1167 (C.D.Cal.1986) (same); *Slagell v. Bontrager*, 616 F.Supp. 634, 636–37 (W.D.Pa.1985) (adopting first-offered test for § 12(a)(1) violations involving unregistered securities); *Morley v. Cohen*, 610 F.Supp. 798, 815–16 (D.Md.1985) ("[T]he court is persuaded that the three-year statute of limitations commences to run on the date the securities were first bona fide offered to the public."); *LeCroy v. Dean Witter Reynolds, Inc.*, 585 F.Supp. 753, 760–61 (E.D.Ark.1984) (adopting, in what may be dictum, the first-offered test, but expressing "some degree of disquietude"); *Morse*, 445 F.Supp. 619 (applying first-offered test in context of § 11 claims); *Fischer v. Int'l Tel. & Tel. Corp.*, 391 F.Supp. 744, 747–48 (E.D.N.Y.1975) ("From every indication in the authorities, the crucial date, i.e., the date when a security is first offered to the public within the meaning of § 77m of Title 15, is not earlier than the effective date of last amendment to the registration statement and not later than the date when the prospectus is released to, or other solicitation is made of, the public."); *Kramer v. Scientific Control Corp.*, 352 F.Supp. 1175, 1176 (E.D.Pa.1973) (accepting, in § 11 and § 12(a)(2) context, first-offered test without discussion); *Osborne v. Mallory*, 86 F.Supp. 869, 873 (S.D.N.Y. 1949) (applying first-offered test without discussion); *cf. Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1173 (S.D.N.Y.1974)(dismissing case for failing to plead compliance with three year repose period by not indicating the date on which security was first offered to the public).

Similarly, most leading commentators have interpreted the language of § 13 as implicating the first offering of a security as the triggering event for the repose period. Loss, *supra*, § 11(D)(2)(a)(i), at 4492–94 ("Presumably [bona fide offered] means *first* offered to the public.") (emphasis in original); Richard W. Jennings et al., *Securities Regulation* 1318 (8th ed. 1998) ("[Section 13] apparently means that as to a portion of an unsold allotment purchased by the plaintiff more than three years after the initial public offering, a possible action under § 12(a)(1) ... was barred before it accrued. While this result is ridiculous, it seems to be what the statute says."); Thomas Lee Hazen, *The Law of Securities Regulation* § 7.10[4], at 666 (4th ed. 2002) ("[I]n the case of a slow offering, it is conceivable that the cause of action would be foreclosed before it even arises. While the wisdom of this result has been questioned ..., the generally accepted rule is that the three year repose period is unconditional....."); J. William Hicks, *Civil Liabilities: Enforcement and Litigation Under the 1933 Act* § 5:50 (2002) ("[A] plaintiff seeking relief under § 12(a)(1) must establish ... that the filing occurred within three years after the security was first bona fide offered to the

public."); 2 ALI, *Federal Securities Code* § 1727 at 812 (1980) ("in the case of a slow offering * * *, a particular buyer might be barred by the statute of limitations before he bought.")

In contrast, we have found only three courts, all district courts, that have adopted the last-offered test. *Bradford*, 809 F.Supp. at 1485–90; *Hudson v. Capital Mgmt. Int'l Inc.*, No. C–81–1737, 1982 WL 1384, at *3 n. 3 (N.D.Cal. Jan. 6, 1982); *In re Bestline Products Sec. & Antitrust Litig.*, No. MDL 162–Civ–JLK, 1975 WL 386, at *1–2 (S.D.Fla. March 21, 1975). *Bestline*, an unpublished district court opinion addressing a motion to dismiss, is the well-spring of these cases, and *Bradford* and *Hudson* rely on it without providing any additional analysis. The relevant text states:

> The defendants' interpretation of the statute [arguing the first-offered approach] is simply at odds with the remedial purposes of the Securities Act of 1933. To hold as the defendants suggest would be to give individuals a license to sell unregistered securities to whomsoever they wished if they first offered the security to a group of people and, so to speak, "ran the gauntlet" for three years. It is doubtful that Congress intended the 1933 Act's goals of registration, disclosure, and private enforcement to be so easily frustrated. As a result, the defendants' interpretation of section 13 must be rejected in favor of the plaintiffs' interpretation, according to which the limitations period began on the date the alleged "security" was last offered to the public.

*In re Bestline*, 1975 WL 386, at *2.

Normally, such a weight of authority in favor of the first-offered test would be determinative. However, an examination of the authorities supporting the first-offered test reveals a dearth of foundational analysis and a large number of courts adopting the first-offered test did so simply because so many other courts had already done so. Therefore, while such a preponderance of precedent is due deference, we cannot end our discussion here.

Before we move on, however, we need briefly to cabin our discussion's structure to the facts of the present case, as elucidated in Stolz's pleadings. We are dealing with a single public offering of unregistered securities that began more than three years before Stolz filed its complaint, but was concluded within the three year repose period. It is not, therefore, the situation of a defendant's being granted immunity to continue illicit offers without civil liability after three years have passed. *See infra.*

In general, a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period. Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit.

> [S]tatutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses ..., the various forms of tolling, and the potential application of the discovery rule. In contrast, statutes of repose affect the availability of the underlying right: That right is no longer available on the expiration of the specified period of time. In theory, at least, the legislative bar to subsequent action is absolute, subject to legislatively created exceptions ... set forth in the statute of repose.

Calvin W. Corman, *Limitation of Actions*, § 1.1, at 4–5 (1991). Therefore, a statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable consider-

ations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action. *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.* 32 F.3d 697, 704 (2d Cir.1994) ("The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation."); *but see* Lyman Johnson, *Securities Fraud and the Mirage of Repose,* 1992 Wis. L.Rev. 607 (1992) (arguing that courts are mistaken to read equitable tolling out of § 13's three-year repose period).

■ In fact, as noted earlier, a repose period can run to completion even before injury has occurred to a potential plaintiff, extinguishing a cause of action before it even accrues. *Stuart v. Am.Cyanamid Co.,* 158 F.3d 622, 627 (2d Cir.1998) (citations omitted); *see also, e.g., Masters v. Hesston Corp.,* 291 F.3d 985, 989 (7th Cir. 2002) (finding Illinois statute of repose for strict product liability actions barred suit against manufacturer of allegedly defective product when injury occurred 24 years after first sale of product); *Lamb By and Through Donaldson v. Volkswagenwerk Aktiengesellschaft,* 631 F.Supp. 1144, 1147 (S.D.Fla.1986) ("Simply stated, a statute of repose is triggered once the product is delivered to its first purchaser. If an injury results from the product after the authorized period has elapsed the victim is without recourse to the manufacturer of the product."); *Nygaard v. Goodin Bros., Inc.,* 107 S.W.3d 190, 192 (Ky.2003) (validating statute that barred re-opening of workers' compensation claims after four years even though claimant's right to reopen based on worsening injury had not yet vested by the time the four-year repose period expired).

This prospect does raise the possibility that a potential plaintiff might, through no lack of diligence on her part, find herself without any recourse for an injury that, if it had occurred earlier, would have been remediable. Such a possibility, however, may not be inconsistent with the purpose of a statute of repose.

> [The statute of repose] does not bar a cause of action; its effect, rather, is to prevent what might otherwise be a cause of action, from ever arising.... The injured party [injured after the repose period has passed] literally has [n]o cause of action. The harm that has been done is *Damnum absque injuria—* a wrong for which the law affords no redress.

*Rosenberg v. Town of North Bergen,* 61 N.J. 190, 199, 293 A.2d 662 (1972).

*Bestline* and its progeny express concern about the securities offeror who, while making his ongoing bona fide offer of unregistered securities to the public, manages to avoid suit for three years, thus securing a sort of immunity to continue illicit offers without civil liability.[6] *In re Bestline,* 1975 WL 386, at *2. This, of course, is not the situation before us in the present case. Admittedly, such a prospect, however remote, is not one to be desired, but, in any event, does not violate, as the plaintiffs argue, the "remedial" purpose of the Act. In principle, by limiting the substantive or procedural rights of plaintiffs, all statutes of limitation or repose always tend to cut against the remedial results that plaintiffs might otherwise

---

**6.** There may be a touch of hyperbole in this hypothetical scenario because it is likely that the SEC is not subject to the § 13 statute of repose and would be able to bring its own civil enforcement action against such a defendant under § 20(b) of the Act. *See SEC v.* *Rind,* 991 F.2d 1486, 1491–93 (9th Cir.1993); *SEC v. Lorin,* 869 F.Supp. 1117, 1120 (S.D.N.Y.1994). Therefore, it is unlikely that an offeror could ever operate with unfettered immunity.

enjoy. And these remedial results may best be furthered, without losing one of the principal benefits of a statute of repose—to provide an easily ascertainable and certain date for the quieting of litigation[7]—by lengthening the period before repose takes effect. This has recently been done, for example, by the Sarbanes Oxley Act, which extends the effective date of the statute of repose from three years to five years. *See* Pub.L. No. 107–204, § 804(a), 116 Stat. 745, 801 (July 30, 2002); *In re Heritage Bond Litigation*, No. CV 01–5752, 2003 WL 22502577 (January 6, 2003).[8]

■ Further, a brief examination of the function of § 13 with respect to *registered* securities convinces us that the first-offered test is the proper one. Section 11 of the Act (15 U.S.C. § 77k) creates a cause of action for purchasers of securities that have registration statements containing false or misleading facts. Section 13's three-year repose period for § 11 liability is triggered, as is the repose period for § 12(a)(1) liability, by the security's being "bona fide offered to the public." In the case of § 11 liability, the repose period is triggered by the effective date of the (allegedly false) registration statement for the offer—*i.e.*, the beginning of the offer. *Finkel*, 962 F.2d at 173; *Griffin*, 84 F.Supp.2d at 512; *Morse*, 445 F.Supp. at 622–24. In the interests of treating the same language in the same statutory section consistently, this treatment of registered securities counsels in favor of treating unregistered securities the same way—*i.e.*, by employing the first-offered test. Nor do there appear to be significantly different interests at stake in claims under § 11 versus claims under § 12(a)(1) that might counsel disparate interpretations of this language. Plaintiffs in both

7. Even with a three-year expiration period, the last-offered approach arguably fails to achieve the certainty and finality of the first-offered approach. Where a first-offered test establishes one and only one date, from which the end of the repose period can be determined, the last-offered approach is, to some degree, fluid and indefinite. Determining when an offer has ended may not be the same objective and inflexible determination as finding when the offer began. While the beginning of an offer is arguably characterized by clear objective attempts to secure purchasers, the end of an offer may disappear into subjectivity and, in any event, can always be changed by another act carrying on the offer (albeit that this additional act is presumably within the control of the defendant.) As the SEC notes in its *amicus brief*, the difficulty of ascertaining the last date of an offering was recognized in 1934 when Congress amended Section 4(1) of the Securities Act, now Section 4(3) of the Act, 15 U.S.C. 77(d)(3). As originally enacted, Section 4(1) required dealers to furnish a prospectus in connection with transactions "within one year after the *last* date upon which the security was bona fide offered to the public." *Securities Act of 1933*, 48 Stat. 74, 73–22, at 77 (May 27, 1933) (emphasis added). In a letter to the Senate Banking and Currency Committee, the Chairman of the Federal Trade Commission recommended that the provision be changed from the last date upon which the security was offered to the first date. 78 Cong. Rec. S8715 (May 12, 1934). Chairman Landis explained that the last date of the offering "might undoubtably be practically impossible to ascertain by particular dealers."

8. Similarly, the defendant's response to this appeal to remedial purpose parallels its contention that a last-offered rule introduces equitable tolling where it has no legitimate place. Under *Bestline*, as long as the defendant continues his unlawful offer, the repose period does not begin to run. *In re Bestline*, 1975 WL 386, at *2. This result resembles equitable tolling where the ongoing unlawful conduct of the defendant lengthens the period in which suit can be brought. However, this effect is not congruent with the repose principle that the actions of the defendant cannot toll the statute. In both instances (equitable tolling and the last-offered test) we would apparently have plaintiffs whose rights are expanded by virtue of the defendant's concealing his misconduct.

circumstances buy securities that are subject to some threshold defect—either a lack of a registration statement or a false or misleading registration statement. In both circumstances, the defendant could fraudulently conceal the fact of his unlawful offer from the plaintiff. After three years of concealment the defendant would, in both instances, secure repose to continue the illegal offer without fear of civil liability under § 11 or § 12(a)(1). And that would mean that, in both instances, a plaintiff subsequently purchasing that defendant's securities would see her right to a cause of action extinguished prior to purchase because of the operation of the repose period. Utilizing the last-offered test for unregistered securities would mean that a plaintiff purchasing unregistered securities was, for no good reason, given greater protection from the repose period than a purchaser of registered securities. There is no persuasive rationale for this difference.[9]

The SEC, in an insightful *amicus* brief, provides additional evidence suggesting that Congress intended the three-year period to begin to run when a security is *first* sold to the public. First, when the Securities Act of 1933 was originally enacted, the present three-year repose period for Section 12(a)(1) claims was a lengthy ten years. *Securities Act of 1933*, 48 Stat. 74, Pub.L. No. 73–22, at 84 (May 27, 1933). Less than the current three-year period, with a ten-year period, the first-offered test would be much more unlikely to present the anomaly of a plaintiff's purchasing after the period expired. While a slow

offer might theoretically continue for more than three years, an offer continuing for more than ten years would indeed be rare. Thus, one of the major problems with interpreting the period of repose as starting at the time of the first offering was of no concern when Congress enacted the statute. On the other hand, with a ten-year expiration period, the last-offered test would have had the notable problem of lingering liability. *See Norris v. Wirtz*, 818 F.2d 1329, 1332 (7th Cir.1987) ("The legislative history in 1934 makes it pellucid that Congress included the statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims.") (*citing* 73 Cong. Rec. 8198–8203 (May 7, 1934)), *overruled on other grounds, Short v. Belleville Shoe Manufacturing Co.*, 908 F.2d 1385 (7th Cir.1990) Thus, it seems likely that, as originally enacted in 1933, the ten-year period of repose referred to ten years from the beginning of the offering. In 1934, when Congress changed the length of the repose period, it gave no indication of an intent to alter the starting point.

Moreover, in 1954, Congress added subsection (e) to Section 24 of the Investment Company Act, 15 U.S.C. § 80a–24(e). This amendment permits the registration of additional securities of open-end investment companies to be effected by amending an earlier registration statement, instead of filing a new one. One section of the amendment provides that "[f]or the purposes of section 13 of the Securities Act * * * no such security shall be deemed to have been bona fide offered to the public

---

**9.** Additionally, the last-offered test would seemingly make the three-year repose little more than surplusage to the one-year statute of limitations. Every potential plaintiff purchasing a defendant's security during an offering period would have at least three years before being constrained by the repose period, since each day during which the offer continued would delay the start of the repose

period. Therefore, the statute would fail to enforce final repose with respect to any plaintiff, with one exception—a plaintiff whose one-year limitations period was tolled not only for the duration of the offer, but for the three years subsequent to the end of the offering period. Otherwise, it would be the one-year statute of limitations that controlled, and the repose provision would have no effect.

prior to the effective date of the latest amendment filed pursuant to this subsection." *1954 Amendments to the Investment Company Act,* 68 Stat. 689, Pub.L. No. 83–857. This provision would have been unnecessary if the three-year period did not start until the end of an offering. If, however, the three-year period started at the beginning of an offering, the 1954 Amendment's permission to register by amending an earlier registration would leave open the possibility that the three-year period would nonetheless start from the date of the earlier registration. Thus, the quoted provision was included to avoid this ambiguity, which was only at issue because Congress interpreted the three-year period as starting at the beginning of the offering. *See* R.W. Jennings, *Securities Regulation,* at 1318 ("In 1954 Congress amended the Investment Company Act to eliminate this problem [arising when an offering extends beyond three years] in connection with the sale of mutual fund shares, where it was most acute.")

The SEC has also presented ample evidence that it has historically recognized the applicable statute of repose as referring to the time a public offering begins rather than ends. In 1941, for instance, the SEC recognized Section 13 as meaning first-offered when it recommended an amendment that would have eliminated the potential immunity provided for later offerings when the three-year provision is construed as beginning to run when a security is first-offered. *See Report of the SEC on Proposals for Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934* at 15 (Aug. 7, 1941) ("Undoubtably through inadvertence the statute of limitation provided in section 13 of the act was so phrased that in some instances the period within which suit may be brought expires before the purchaser acquires his security."). The proposed amendment was never adopted. In 1981, the SEC again implicitly recognized that

the relevant standard was first-offered rather than last-offered when it adopted Item 512(a)(2) of Regulation S–K. *See* Regulation S–K, 17 C.F.R. § 229.512(a)(2) ("for purposes of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.") This provision would not have been necessary under the last-offered approach for the same reason Congress' Amendment to the Investment Company Act would not have been necessary. Despite the problem of potential immunity for later offerings, we are bound by the apparent intent of Congress that Section 13's "bona fide offered to the public" refers to the time when the stock is initially bona fide offered to the public. We are therefore in agreement with the SEC and the majority of courts and commentators that have spoken to the issue.

### 3. *Conclusion*

Taking the facts pleaded as true, the defendant bona fide offered to the public the security at issue in the present case in July of 1997, and the original complaint filed by Stolz was filed on February 20, 2001. Stolz's § 12(a)(1) claim was filed more than three years after the security was bona fide offered to the public, and is therefore barred by § 13's statute of repose.

### II.

For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the district court.

CALABRESI, Circuit Judge, concurring.

I join the bulk of Judge Cudahy's thoughtful opinion, and fully concur in the result reached in it. Specifically, I agree

that § 13 applies the "first-offered test." I add a few words simply to say that I believe the "first-offered" test to be profoundly unwise no matter how long the repose period. Giving repose to a defendant who has ceased to do wrong may well be worthwhile even if it is "unfair" to a plaintiff whose cause of action has not yet accrued. But it is a different thing altogether to give repose to a defendant who continued his wrongful conduct, perhaps even beyond the time specified by the repose period. Nevertheless, I am convinced that Congress intended that test to govern, however strange the result. [See Richard W. Jennings et al., *Securities Regulation* 1318 (8th ed.1998), agreeing with this interpretation but calling it "ridiculous." See also the SEC's attempts to alter the test by legislation, *Report of the SEC on Proposals for Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934* at 15 (Aug. 7, 1941), in which the SEC describes the "first-offered test" as due to "inadvertence."] For this reason, I agree with Judge Cudahy's conclusion in § II(B)(2), as I do with the rest of his opinion.