UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2023

(Argued: May 1, 2024     Decided: January 7, 2025)

Docket No. 23-394-cv(L), 23-568-cv(CON), 23-670-cv(CON)

_____

JUAN B. PUJOL MOREIRA, IN HIS PERSONAL CAPACITY AND AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR OF THE ESTATE OF NIEVES PUJOL, A/K/A NIEVES MOREIRA MARTINEZ, MARIA JULIA PUJOL MOREIRA, INES MARIA PUJOL FAGET, AS PERSONAL REPRESENTATIVE AND EXECUTOR OF THE ESTATE OF ARCADIO JOAQUIN PUJOL IZQUIERDO, SARA L. PUJOL, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR OF THE ESTATE OF LAUREANO PUJOL ROJAS, LUIS R. PUJOL ROJAS, ANA H. FRAGA, LORENZO PEREZ PUJOL, FRANCISCO PUJOL MENESES, PILAR M. PUJOL MENESES, RAUL PUJOL MENESES, SUCESORES DE DON CARLOS NUÑEZ Y DONA PURA GALVEZ, INC., DBA BANCO NUÑEZ, GLORIA PILAR MOLINE, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR OF THE ESTATE OF THOMAS TORRALBAS NUÑEZ, CARLOS NUÑEZ TARAFA, PURA AMERICA OCHOA NUÑEZ, GLORIA TORRALBAS NUÑEZ, NORKA CABANAS NUÑEZ, LOURDES NUÑEZ, AS PERSONAL REPRESENTATIVE AND ADMINISTRATOR OF THE ESTATE OF ALEJANDRO NUÑEZ TARAFA, MYRIAM E. NUÑEZ, AS PERSONAL REPRESENTATIVE AND EXECUTOR OF THE ESTATE OF NESTOR FRANCISCO NUÑEZ GALVEZ, SILVIA NUÑEZ TARAFA, EILEEN DOMINGUEZ, AS PERSONAL REPRESENTATIVE AND EXECUTOR OF THE ESTATE OF BLANCA NUÑEZ, CARLOS CABANAS NUÑEZ, CARLOS ARSENIO NUÑEZ RIVERO, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE AND EXECUTOR OF THE ESTATE OF CARIDAD MARIA RIVERO CABALLERO,
*Plaintiffs-Appellants*,

v.

SOCIÉTÉ GÉNÉRALE, S.A., DBA SOCIÉTÉ GÉNÉRALE AMERICAS, BNP PARIBAS, S.A.,
*Defendants-Appellees*,

THE BANK OF NOVA SCOTIA, DBA SCOTIA HOLDINGS (US) INC., AKA THE BANK OF NOVA SCOTIA, MIAMI AGENCY, THE NATIONAL BANK OF CANADA, DBA NATIONAL BANK OF CANADA FINANCIAL GROUP INC., BANCO BILBAO VIZCAYA ARGENTARIA S.A., DBA BBVA, USA, SOCIT GNRALE, S.A.,

*Defendants.*[*]

———————————————————

Before:     JACOBS, SACK, AND SULLIVAN, *Circuit Judges.*

The principal issue on this consolidated appeal is whether 22 U.S.C. § 6084, the time bar provision of the Helms-Burton Act, Pub. L. No. 104-114, 110 Stat. 785 (1996), is a statute of repose or a statute of limitations.

Plaintiffs are successors-in-interest to assets seized by the Cuban regime many decades ago. In 1996, Congress created a private cause of action for United States nationals against "any person" who "traffics" in that "confiscated" property, 22 U.S.C. § 6082(a)(1)(A), by passing the Helms-Burton Act. Yet, no action could be brought until May 2019 because, until then, every President used his authority under the Act to suspend the private right of action. *See* 22 U.S.C. § 6085(c)(1)–(2). When the plaintiffs ultimately brought suit against BNP Paribas, S.A. and Société Générale, S.A., the banks moved to dismiss under Rule 12(b)(1), (2), and (6) on, *inter alia*, the grounds that the plaintiffs lacked Article III standing, that most of their allegations were time-barred under section 6084, and that the timely allegations failed to plausibly allege trafficking as defined by section 6023(13)(A).

For the reasons that follow, we conclude that (1) the plaintiffs have Article III standing, but (2) their allegations predating the filing of their respective complaints by two years or more are untimely because section 6084 is a statute of repose, and no basis for tolling the time bar exists, and (3) the remaining allegations fail to plausibly allege a violation of the Helms-Burton Act. We therefore AFFIRM the judgments of the district courts.

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

DWAYNE A. ROBINSON (Javier A. Lopez,
Benjamin J. Widlanski, Eric S. Kay, *on the
brief*), Kozyak Tropin & Throckmorton LLP,
Miami, FL, *for Appellants*;

STEVEN WOLOWITZ (Alex Lakatos, Charles
A. Rothfeld, *on the brief*), Mayer Brown
LLP, New York, NY and Washington, DC,
*for Appellee Société Générale*;

CARMINE D. BOCCUZZI, JR. (Chihiro Isozaki,
Adair Kleinpeter-Ross, *on the brief*), Cleary
Gottlieb Steen & Hamilton LLP, New York
NY, *for Appellee BNP Paribas, S.A.*

SACK, *Circuit Judge*:

In 1960, Cuba's Castro regime seized Banco Nuñez and Banco Pujol, two

privately held Cuban banks, and absorbed their assets into Banco Nacional de

Cuba ("BNC"), the country's primary financial institution. Decades later, in

1996, Congress passed the Helms-Burton Act, Pub. L. No. 104-114, 110 Stat. 785

(1996), 22 U.S.C. §§ 6021-6091 (the "Act"). The Act authorizes United States

nationals with claims to property theretofore confiscated by Cuba's regime to

bring private civil damages suits against "any person" that "traffic[ked]" in such

"confiscated" property. 22 U.S.C. § 6082(a)(1)(A). Successors-in-interest to the

assets of Banco Nuñez brought a Helms-Burton action against, *inter alia*, the

3

French bank Société Générale, S.A. ("SocGen") (the "*Sucesores* Action") in the Southern District of Florida; that action was ultimately transferred to the United States District Court for the Southern District of New York (Mary Kay Vyskocil, *Judge*), after which the French bank BNP Paribas, S.A. ("Paribas") was added as a defendant.  Similarly, successors-in-interest to the assets of Banco Pujol brought two related Helms-Burton actions against Paribas and SocGen (collectively, the "*Pujol* Actions") in the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*).  The materially identical complaints alleged that the two banks had "traffic[ked]" in the plaintiffs' confiscated property by providing BNC with U.S. dollar financing and credit, deliveries of parcels of U.S. currency, and non-U.S. dollar financing.  Important here, the *Sucesores* and *Pujol* Actions were not brought until 2019 and 2020, respectively, because until May 2019, every incumbent United States President had suspended the private right of action pursuant to 22 U.S.C. § 6085(c)(1) and (2), two other provisions of the Act.

The defendants in each action moved to dismiss.  Both district courts granted the respective motions on the grounds that most of the allegations were untimely under 22 U.S.C. § 6084, which each court construed as a statute of

4

repose. Judge Furman dismissed the remaining allegations for failure to plausibly allege a claim of trafficking pursuant to Federal Rule of Civil Procedure 12(b)(6), whereas Judge Vyskocil dismissed them both for failing to state a claim and pursuant to Federal Rule of Civil Procedure 12(b)(2) on the grounds that the plaintiffs had not provided a basis for exercising personal jurisdiction.

On this consolidated appeal, we must decide (1) whether the plaintiffs have Article III standing to bring their Helms-Burton Act claims; (2) whether 22 U.S.C. § 6084 is a statute of limitations (and thus subject to equitable tolling by a court), or a statute of repose (subject only to tolling as permitted by statute); (3) whether the time bar should have been tolled—either equitably (if it is a statute of limitations) or statutorily as a result of the Presidential suspensions from 1996 to 2019 of the right to bring an action under the Act (if it is a statute of repose); and (4) whether any timely allegations state a plausible claim for relief.

For the reasons that follow, we conclude that the plaintiffs have Article III standing, but that section 6084 is a statute of repose and was not statutorily tolled, and that any timely allegations of conduct fail to state a plausible claim

under Rule 12(b)(6).[1]  We therefore affirm the judgments of the two district

courts.

## BACKGROUND

### I.      Factual Background

A.      <u>The Castro Regime's Seizure of Banco Pujol and Banco Nuñez in 1960</u>

In 1960, Fidel Castro's Communist regime in Cuba seized several

privately owned Cuban banks and absorbed their assets into Banco Nacional de

Cuba ("BNC"), the country's centralized financial institution.  The banks seized

included Banco Pujol and Banco Nuñez, which in 1958 controlled assets worth

$25.1 million and $105.1 million, respectively.  Many Cubans who lost their

property through those seizures fled to the United States, holding out hope that

they could one day reclaim it.  *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916,

919 (11th Cir. 2023) (per curiam).

B.      <u>The Helms-Burton Act</u>

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity

Act, also known as the Helms-Burton Act.  Pub. L. No. 104-114, 110 Stat. 785

(1996) (codified at 22 U.S.C. §§ 6021-6091).  The Helms-Burton Act (the "Act")

---

[1] Because we affirm the dismissal of the plaintiffs' timely allegations on the ground that they fail to state a plausible claim under Rule 12(b)(6), we do not reach the issue of personal jurisdiction.

created a cause of action that authorized United States nationals holding claims

in property confiscated by the Cuban government on or after January 1, 1959, to

bring a private civil action against "any person that . . . traffics" in such

"confiscated" property. 22 U.S.C. § 6082(a)(1)(A). The Act defines a person who

"traffics" in confiscated property as someone who "knowingly and

intentionally," and "without the authorization of any United States national who

holds a claim to the property":

> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person[.]

*Id.* § 6023(13)(A).[2]

In the Act, Congress identified several purposes it is supposed to serve,

including "strengthen[ing] international sanctions against the Castro

---

[2] "[K]nowingly" is defined as "with knowledge or having reason to know." 22 U.S.C. § 6023(9). The Act does not define "intentionally."

7

government," "encourag[ing]" Cuba's transition to a democratic society,

ensuring the "national security of the United States" against the Castro regime's

"threats . . . of terrorism[ and] theft of property from United States nationals,"

and "protect[ing] United States nationals against confiscatory takings and the

wrongful trafficking in property confiscated by the Castro regime."  *Id.* § 6022.

Several provisions of the Act restrict whether and when an action under

the Act may be brought.  Section 6084 states:  "An action under section 6082 of

this title may not be brought more than 2 years after the trafficking giving rise to

the action has ceased to occur."  *Id.* § 6084.  The Act further permits the President

of the United States to

> suspend the right to bring an action . . . for . . . 6 months if the
> President . . . determines and reports in writing to the appropriate
> congressional committees at least 15 days before . . . that such
> suspension is necessary to the national interests of the United States
> and will expedite a transition to democracy in Cuba.

*Id.* § 6085(c)(1)(B).  Applying the same process and criteria, the President may

issue additional six-month suspensions for as often as he sees fit.  *Id.* § 6085(c)(2).

And "[t]he President may rescind any [such] suspension," provided that he

"report[s] to the appropriate congressional committees that doing so will

expedite a transition to democracy in Cuba."  *Id.* § 6085(d).

8

C.      Suspension of the Act Until 2019 and the Plaintiffs' Subsequent Suits

From the Act's enactment in 1996, the private right of action—also known

as "Title III"—"remained dormant for 23 years . . . through three different

[Presidential] administrations, because the right to bring an action . . . was

[continuously] suspended by Presidential decree" pursuant to sections

6085(c)(1)(B) and (2).  *Garcia-Bengochea*, 57 F.4th at 919.  In May 2019, however,

President Trump lifted that suspension.  Thereafter, plaintiffs across the country

took to the federal courts to bring suits under Title III.  *See, e.g.*, *Havana Docks*

*Corp. v. Carnival Corp.*, 19-cv-21724 (BB) (S.D. Fla. filed May 2, 2019); *Exxon Mobil*

*Corp. v. Corporacion CIMEX S.A.*, 19-cv-1277 (APM) (D.D.C. filed May 2, 2019);

*Glen v. TripAdvisor LLC*, 19-cv-1809 (LPS) (D. Del. filed Sept. 26, 2019); *N. Am.*

*Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 20-cv-22471 (DPG) (S.D.

Fla. filed June 15, 2020).

This consolidated appeal concerns three actions with materially identical

allegations against Société Générale, S.A. ("SocGen") and BNP Paribas, S.A.

("Paribas"), two French multinational banks.  Two of these actions (together, the

"*Pujol* Actions") were brought by individuals holding interests in the confiscated

assets of Banco Pujol, as well as administrators and representatives of such

9

individuals (the "*Pujol* plaintiffs").[3]  The third action (the "*Sucesores* Action") was brought by individuals holding interests in the confiscated assets of Banco Nuñez, administrators and representatives of such individuals, and Sucesores de Don Carlos Nuñez y Dona Pura Galvez, Inc., a corporation formed "[f]or the sole purpose of consolidating and asserting interests in" Banco Nuñez (the "*Sucesores* plaintiffs").  *Sucesores* TAC ¶ 3.[4]

D.    Plaintiffs' Allegations

The plaintiffs' theory is that Paribas and SocGen wrongfully trafficked in confiscated property as defined under Title III by engaging in various financing and business activities with BNC and other Cuban banks (which presumably, too, involved confiscated property).  These allegations fall into two categories. The first is conduct by Paribas and SocGen running until approximately 2010— conduct which had occurred some nine years before the plaintiffs filed their complaints in 2019 and 2020, and which Paribas and SocGen argue is time-barred

---

[3] On November 9, 2020, the *Pujol* plaintiffs filed their original complaint in the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*) ("*Pujol I*").  This action was later consolidated with a second action ("*Pujol II*") brought by a subset of the *Pujol* plaintiffs against the same defendants.  Both cases were litigated on the docket of *Pujol I* while *Pujol II* was stayed pending the outcome of the consolidated case on the *Pujol I* docket.

[4] This opinion refers to the operative complaints in the *Pujol I* and *Sucesores* Actions as "*Pujol* SAC" (the Second Amended Complaint in *Pujol I*) and "*Sucesores* TAC" (the Third Amended Complaint in *Sucesores*).

under section 6084.  The second is conduct by Paribas and SocGen running until 2018 and after—allegations of which the banks argue fail to state a claim.

    *1.    Allegations Regarding Conduct Through 2010.*

**Paribas**.  The plaintiffs allege that "from at least 2000 to 2010, Paribas offered U.S.-dollar financing to Cuban entities," mainly "through eight credit facilities operated with the involvement of [BNC and other] Cuban banks," through which "Paribas processed more than $1.747 billion in U.S. dollar-denominated transactions."  *Pujol* SAC ¶ 46; *Sucesores* TAC ¶ 52.[5]  One of these credit facilities "financ[ed] a Cuban entity's purchase of oil in U.S. dollars from the Netherlands" through "a number of bank-to-bank transfers" that would usually be routed "through Paribas' New York branch."  *Pujol* SAC ¶ 47; *Sucesores* TAC ¶ 53.  Paribas further gave "Cuban banks" "access to U.S. dollars" by opening "U.S.-dollar accounts" with those banks.  *Pujol* SAC ¶ 46; *Sucesores* TAC ¶ 52.[6]

---

[5] Double citations after quotations refer to identical language in the *Pujol* SAC and *Sucesores* TAC.  We do not additionally cite to the operative complaint in *Pujol II* because it, too, is materially identical to the *Pujols* SAC and *Sucesores* TAC.

[6] Paribas admitted to much of this conduct when, on June 27, 2014, it pleaded guilty to conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, by conspiring to violate the International Emergency Economic Powers Act, 50 U.S.C. §§ 1702, 1705, the Trading with the Enemy Act, 50 U.S.C. §§ 4303, 4305, 4315(a), and regulations

11

*SocGen*. As to SocGen, the plaintiffs allege that, between 2000 and 2010, it operated at least twenty U.S. dollar-denominated credit facilities "for or involving Cuban entities," six of which "involved loans directly [or indirectly] to BNC." *Pujol* SAC ¶ 38; *Sucesores* TAC ¶ 44. "SocGen processed at least 2,500 transactions . . . valued at $13 billion" through these facilities, all via New York-based financial institutions. *Pujol* SAC ¶¶ 4, 39; *Sucesores* TAC ¶¶ 4, 45. As part of one of those credit facilities, SocGen, with another French bank that the plaintiffs allege was Paribas, "provided a $40 million revolving line of credit to finance the importation of crude oil from the Netherlands by . . . a Cuban government-owned corporation[]." *Pujol* SAC ¶¶ 38, 47; *Sucesores* TAC ¶¶ 44, 53.[7]

2.    *Allegations Regarding Conduct Through at Least 2018*

The plaintiffs allege that after admitting to their wrongdoing to U.S. prosecutors, Paribas and SocGen "continue[d]" to provide BNC and other Cuban

---

promulgated thereunder. *Pujol* SAC ¶¶ 22 n.5, 46–47, 54 & Ex. 3; *Sucesores* TAC ¶¶ 52–53, 60 & Ex. 2.

[7] Similar to Paribas, SocGen admitted to this conduct on November 18, 2018 in a deferred-prosecution agreement in which it consented to the filing of an information charging it with one count of conspiring to violate the Trading with the Enemy Act, 50 U.S.C. §§ 4303, 4305, 4315(a), and regulations promulgated thereunder. *Pujol* SAC ¶¶ 21, 37–39 & Ex. 2; *Sucesores* TAC ¶¶ 43–45 & Ex. 4.

entities with credit facilities "similar" to the ones Paribas and SocGen had provided before, "except [that the new] facilities exclude[d] U.S.-dollar transactions to avoid U.S. law." *Pujol* SAC ¶ 63; *Sucesores* TAC ¶ 67; *see also Pujol* SAC ¶ 69; *Sucesores* TAC ¶ 73. In response to demand letters sent by the plaintiffs, "[n]either [d]efendant represented that it would cease extending credit facilities to BNC, providing BNC with access to U.S. dollars, or otherwise trafficking in confiscated property." *Pujol* SAC ¶ 64; *Sucesores* TAC ¶ 69.

Beyond their allegations that the defendants did not truly cease the wrongdoing to which they pleaded guilty, the plaintiffs allege the following.

*Paribas*. "According to a former Paribas compliance officer, Paribas routinely provide[d] to BNC in Switzerland parcels of U.S. currency," including in 2020. *Pujol* SAC ¶ 49; *Sucesores* TAC ¶ 55. Through those deliveries of cash, "[u]pon information and belief," BNC "continue[d] to access international markets and conduct transactions . . . that it would not otherwise be able to access or conduct." *Pujol* SAC ¶ 49; *Sucesores* TAC ¶ 55.

The plaintiffs further allege that Paribas (1) provided banking services to a German company that made payments into a BNC account until at least 2020, enabling "the purchase of fuel from" a Cuban government-owned airline; (2)

13

provided a loan, which was still being repaid in early 2020, to a French company that in turn sold locomotives and rolling stock to a Cuban entity; and (3) through a subsidiary, invested in Melbana Energy between 2018 and 2020, which in turn entered contracts with a Cuban state-affiliated steelmaker. *Pujol* SAC ¶ 56; *Sucesores* TAC ¶ 62. The operative *Pujol* complaint additionally alleges that, until at least December 2018, Paribas provided banking services to RaFin, S.A., an investment firm controlled by the Cuban military. *Pujol* SAC ¶ 56.

*SocGen*. Based on reports from a SocGen employee who "helped create SocGen's 'Cover Procedures,' which were used to conceal U.S. dollar-denominated transactions with BNC," the plaintiffs allege that SocGen continued to profit from "providing Cuban entities access to foreign currency" until at least September 2019. *Pujol* SAC ¶ 40; *Sucesores* TAC ¶ 46. "[U]pon information and belief," the plaintiffs allege, BNC was involved in these transactions because BNC is the "primary financial institution with whom foreign companies do business in or with Cuba." *Pujol* SAC ¶ 40; *Sucesores* TAC ¶ 46; *see also Pujol* SAC ¶ 63 (similar); *Sucesores* TAC ¶ 67 (similar). The plaintiffs then infer that SocGen profited by giving BNC "access to U.S. dollars and other foreign currency that

14

Cuba and . . . []BNC[] could not themselves access or provide to BNC's clients."

*Pujol* SAC ¶¶ 40, 42; *Sucesores* TAC ¶¶ 46, 48.

## II.    Procedural Background

### A.    The *Pujol* Actions

In February 2020, the plaintiffs in the *Pujol* Actions sent Paribas a demand letter that asserted that the bank was trafficking in confiscated property through its dealings with BNC and announced the plaintiffs' intent to bring a Helms-Burton action against it. *Pujol* SAC ¶¶ 59, 61; *see* 22 U.S.C. § 6082(a)(3)(D) (setting out pre-suit notice requirements for "[i]ncreased liability"). In August 2020, the *Pujol* plaintiffs did the same with respect to SocGen. *Pujol* SAC ¶ 60. On November 9, 2020, the *Pujol* plaintiffs filed their original complaint in the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*) ("*Pujol I*"). This action was later consolidated with a second action ("*Pujol II*") brought by a subset of the *Pujol* plaintiffs against the same defendants. On November 24, 2021, the district court dismissed the once-amended complaint without prejudice, holding that the plaintiffs had standing to bring suit, but that their claims—based on allegations of SocGen and Paribas's conduct extending only through 2010—were time-barred under 22 U.S.C. § 6084. Section 6084, the district court reasoned, was a statute of repose not subject to

15

equitable tolling, and the Act contained no applicable legislative exceptions to section 6084's time bar.

In their Second Amended Complaint, the *Pujol* plaintiffs added allegations as to SocGen's and Paribas's conduct from 2018 and after, as discussed above. Paribas and SocGen again moved to dismiss. On January 23, 2023, the district court granted the motion with respect to the plaintiffs' claims against SocGen, this time with prejudice, on the ground that the new allegations regarding SocGen's business dealings involving Cuban entities were conclusory and therefore failed to state a claim under Rule 12(b)(6). The district court held that similar allegations against Paribas were likewise conclusory, but ordered additional briefing as to whether (1) the allegation that Paribas delivered parcels of U.S. currency to BNC in Switzerland satisfied the Helms-Burton Act's definition of "traffic[king]," and (2) the district court could validly exercise personal jurisdiction over Paribas. On February 16, 2023, the district court dismissed the claims against Paribas with prejudice on the ground that the cash-parcel allegation did not plausibly satisfy the Act's definition of "trafficking."[8]

---

[8] The district court accordingly did not reach the issue of personal jurisdiction.

On March 20, 2023, the *Pujol* plaintiffs timely appealed.[9]

B.  The *Sucesores* Action

On June 10, 2019, the plaintiffs in *Sucesores* served a demand letter on SocGen notifying it of their intent to bring a Helms-Burton action against it. *Sucesores* TAC ¶¶ 65–66; *see* 22 U.S.C. § 6082(a)(3)(D).  The *Sucesores* plaintiffs then brought suit against SocGen (and several defendants that have since been voluntarily dismissed) in the United States District Court for the Southern District of Florida (Darrin P. Gayles, *Judge*).  After SocGen argued, in a motion to dismiss, that it was not subject to personal jurisdiction in Florida, the case was consensually transferred to the United States District Court for the Southern District of New York (Kimba M. Wood, *Judge*) on February 4, 2020.

On February 19, 2020, the *Sucesores* plaintiffs sent a demand letter to Paribas.  *Sucesores* TAC ¶ 66.  On September 11, 2020, the plaintiffs filed a Second Amended Complaint naming both SocGen and Paribas as defendants; like the amended complaint in *Pujol I*, this complaint only included specific allegations regarding SocGen's and Paribas's conduct through 2010.  On December 22, 2021,

---

[9] On March 15, 2023, the district court dismissed the operative complaint in *Pujol II* (which had been stayed pending the outcome of the consolidated case on the *Pujol I* docket) with prejudice in light of the dismissal of the Second Amended Complaint in *Pujol I*.  On April 13, 2023, the plaintiffs in *Pujol II* timely appealed.

the district court dismissed the complaint without prejudice, holding, *inter alia*, that the plaintiffs (1) had standing to sue, but (2) failed to plausibly plead that SocGen and Paribas had acted "knowingly and intentionally," as required by 22 U.S.C. § 6023(13)(A).  The plaintiffs filed the Third Amended Complaint seeking to cure those deficiencies with allegations materially identical to those that were added to the Second Amended Complaint in *Pujol*.  On March 30, 2023, Judge Mary Kay Vyskocil, to whom this case had been reassigned, dismissed the complaint under Rules 12(b)(2) and (6), this time with prejudice, holding that the new allegations, too—except as to Paribas's deliveries of parcels of U.S. currency to BNC in Switzerland—failed to plausibly plead that the defendants did any business with BNC after being put on notice of their purported trafficking conduct.  The district court also held that all claims predicated on allegations of SocGen's conduct before July 2017 and of Paribas's conduct before September 2018 were untimely because section 6084 was a statute of repose, and that it could not exercise personal jurisdiction over Paribas in New York with respect to any claim arising from the cash-parcel allegation.

On April 20, 2023, the *Sucesores* plaintiffs timely appealed.  The action was consolidated with the *Pujol* Actions into the instant single appeal to this Court.

## DISCUSSION

### I. Standing

The district courts in *Pujol* and *Sucesores* both found that the plaintiffs had

alleged sufficient facts to support Article III standing at this stage of the

litigation.  We agree.

### A. Legal Framework

"[B]ecause standing is jurisdictional under Article III, it is a threshold

issue" that must be addressed before merits questions such as timeliness and

plausibility.  *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers &*

*Lybrand, LLP*, 322 F.3d 147, 156 (2d Cir. 2003) (alterations adopted) (citation

omitted).  "We review *de novo* the district court's determination on standing."

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 357 (2d Cir. 2016).

Where, as here, "standing is challenged on the basis of the pleadings, we accept

as true all material allegations of the complaint, and must construe the complaint

in favor of the complaining party."  *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th

276, 283 (2d Cir. 2023) (citation omitted).

To establish standing under Article III of the Constitution, a "plaintiff must

have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

19

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020) (holding that plaintiffs had failed to establish standing because they "ha[d] failed to plausibly and clearly allege a concrete injury").

B.    Analysis

*Injury-in-fact*.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Alleging a statutory violation does not, by itself, satisfy the injury-in-fact requirement for Article III standing if the underlying injury is not sufficiently concrete. *Thole*, 590 U.S. at 544 (citing *Spokeo*, 578 U.S. at 341); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete

harm under Article III.").  Concrete injuries encompass both "traditional tangible harms, such as physical . . . or monetary harms," *TransUnion LLC*, 594 U.S. at 425, and "intangible harms" that involve injuries with "'a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.'"  *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 52 (2d Cir. 2024) (quoting *Spokeo*, 578 U.S. at 341).

The plaintiffs here bring a statutory cause of action—*i.e.*, that the defendants allegedly "traffic[ked]" in their "confiscated property."  *See* 22 U.S.C. § 6082; *see also id.* § 6023(4), (13)(A).  They maintain that SocGen and Paribas "used, exploited, and derived benefits from [the plaintiffs'] confiscated property, without their permission and without compensating them for the property's use."  Spec. App'x at 7 (alterations adopted); *see, e.g.*, *Pujol* SAC ¶¶ 29, 43–44, 52, 54–55; *Sucesores* TAC ¶¶ 33, 49–50, 58, 60–61.  That injury is sufficiently concrete and thus legally cognizable, the plaintiffs argue.

We agree.  First, the defendants' alleged conduct—whereby the banks used, and profited from BNC's use of, the confiscated banking assets "without permission and without payment"—inflicts "a pocketbook injury" on the plaintiffs and therefore "constitutes an ongoing and tangible financial harm."

*Garcia-Bengochea*, 57 F.4th at 924–25; *see* Spec. App'x at 61 ("[A] plaintiff is injured concretely when she is shut out wrongfully from the gains produced by exploiting property that is rightfully hers."). But even assuming that the harm here is an intangible one, it is sufficiently concrete.

As both district courts concluded, the closely related harm recognized at common law and elevated to a statutory cause of action under the Act is unjust enrichment. Spec. App'x at 8 (*Pujol*); *id.* at 59 (*Sucesores*). An unjust enrichment action at common law requires a showing "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Colum. Mem'l Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022) (alteration adopted) (internal quotation marks and citations omitted).[10] The Helms-Burton Act sought to remedy a substantially similar harm. In its findings section, the Act states that "[t]he international judicial system . . . lack[ed] fully effective remedies for the wrongful confiscation of property and for *unjust enrichment* from the use of

---

[10] Both district courts relied on New York law for their discussion of the unjust enrichment standard. *See* Spec. App'x at 8 (*Pujol* opinion, citing *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984) (citing in turn *Miller v. Schloss*, 113 N.E. 337 (N.Y. 1916))); *id.* at 60 (*Sucesores* opinion, citing *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011)). Neither party here argues that, if the analogy between the harms addressed by a Title III claim and a common-law unjust enrichment claim is appropriate, New York law should not govern.

22

wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property," 22 U.S.C. § 6081(8) (emphasis added), and that, "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures," *id.* § 6081(11). And the Act's broad definition of "traffic[king]" undoubtedly targets parties that derived benefits from "commercial activity" involving "confiscated property," even though these parties are not alleged to have been involved in the wrongful confiscation of that property in the first place. *See id.* § 6023(13).

The defendants object that the analogy to unjust enrichment is inapt because they did not inflict any losses on the plaintiffs—and thus were not enriched at the *plaintiffs' expense*. We are not persuaded. "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized [at common law] . . . , we do not require an exact duplicate." *TransUnion LLC*, 594 U.S. at 433. Such a "close relationship" exists here. As alleged, SocGen and Paribas benefited from the plaintiffs' exploited property—

they "engag[ed] in commercial activity with BNC," which was bolstered by "[the plaintiffs'] wrongfully confiscated assets," and "earn[ed] significant profits" from such activity. *See Pujol* SAC ¶¶ 36, 41, 52; *Sucesores* TAC ¶¶ 42, 47, 58. Meanwhile, the plaintiffs were "not receiving the benefit of [their] interest in [their] [p]roperty." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1228 (S.D. Fla. 2020). For example, the plaintiffs have been unable to invest their assets and seek a return on their investment. *See also* Spec. App'x at 8–9 (*Pujol* opinion, concluding that there is a close relationship between injury identified by the Act and unjust enrichment); *id.* at 60 (*Sucesores* opinion, concluding same). Like the Fifth and Eleventh Circuits, we therefore conclude that the "remedy Congress created [under the Helms-Burton Act] bears a close relationship to the remedy of unjust enrichment." *Garcia-Bengochea*, 57 F.4th at 925; *see Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 334 (5th Cir. 2021) (same). The plaintiffs have met their burden of pleading a legally cognizable injury-in-fact.

*Causation*. The plaintiffs have also adequately alleged that their injury is "fairly traceable" to SocGen and Paribas, a burden that "is relatively modest at [the motion-to-dismiss] stage." *Bennett v. Spear*, 520 U.S. 154, 170–71 (1997). SocGen and Paribas allegedly perpetrated the trafficking at issue here through,

*inter alia*, multiple credit and financing arrangements involving BNC. The

defendants object that these activities were wholly unconnected to the Cuban

Castro regime's confiscation of Banco Pujol and Banco Nuñez in 1960. That

misses the mark because the conduct giving rise to the injury at issue here is the

*trafficking* in that property, not its confiscation. "Congress did not intend for the

causal link to stop at the Cuban government's confiscation. Instead, it observed

that the rightful owners' injury stemmed from both the Cuban government's

confiscation of the property and subsequent traffickers' use of that confiscated

property." *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 327–28 (D. Del. 2021),

*aff'd*, No. 21-1842, 2022 WL 3538221 (3d Cir. Aug. 18, 2022).

*Redressability*. As to redressability, there is no dispute that the money

damages the plaintiffs seek would make them whole.

Accordingly, we affirm the two district courts' decisions that the plaintiffs

have met their burden, at the motion-to-dismiss stage, to establish Article III

standing.

## II. Time-Bar

Both district courts held that, for each defendant, any claims predicated on

alleged trafficking conduct that occurred more than two years before the

25

defendant was first named in the complaint was time-barred under section

6084.[11]  The courts reasoned that section 6084 is a statute of repose and therefore

could not be equitably tolled by a court, and that the Act itself contained no

exceptions that legislatively tolled the time bar.  We agree.

A.      <u>Legal Framework</u>

"[W]e review questions of statutory interpretation *de novo*."  *United States*

*v. Gu*, 8 F.4th 82, 86 (2d Cir. 2021) (citation omitted).  And "[w]e review *de novo* a

district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the

complaint liberally, accepting all factual allegations in the complaint as true, and

drawing all reasonable inferences in the plaintiff's favor."  *Mazzei v. The Money*

*Store*, 62 F.4th 88, 92 (2d Cir. 2023) (citation omitted).  Specifically, we review *de*

*novo* a district court's grant of a Rule 12(b)(6) motion on the ground that a claim

is time-barred.  *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10

F.4th 87, 102–03 (2d Cir. 2021).[12]

---

[11] In the *Sucesores* Action, SocGen was first named as a defendant on July 10, 2019, and Paribas was first named as a defendant on September 11, 2020.  In the *Pujol* Actions, SocGen and Paribas were both first named as defendants on November 9, 2020.  The time bars for each defendant in each action, as applied by the district courts, were keyed to these dates.

[12] The plaintiffs argue that they were not required to plead timeliness because "Federal Rule of Civil Procedure 8(c) places the burden of pleading an affirmative defense on the defendant."  *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 195 (2d Cir. 2021).  The defendants rejoin that

The central issue on this appeal is whether section 6084 is a statute of limitations, which "may be subject to equitable . . . tolling" by a court, or a statute of repose, which may be tolled pursuant "only to legislatively created exceptions" codified in the statute. *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (internal quotation marks, alteration, and citations omitted). Courts can toll statutes of limitations, but not statutes of repose, because each type of statute "has a distinct purpose and each is targeted at a different actor." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014). "Statutes of limitations are designed to encourage *plaintiffs* to pursue diligent prosecution of known claims." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 504 (2017) (emphasis added) (internal quotation marks and citation omitted). Consistent with that purpose, statutes of limitations "begin to run"

---

only a statute of limitations is an affirmative defense, whereas a "statute of repose . . . is a substantive element of the claim," *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 23 F. Supp. 3d 203, 208 (S.D.N.Y. 2014), and thus must be pleaded by the plaintiff, *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 530–31 (S.D.N.Y. 2010), *aff'd*, 410 F. App'x 408 (2d Cir. 2011) (summary order). On the posture of this case—review of a grant of a Rule 12(b)(6) motion—this disagreement is academic. Even assuming *arguendo* that the defendants had the burden to raise timeliness, "[d]ismissal under [Rule] 12(b)(6) is appropriate when a defendant raises . . . lack of timeliness[] as an affirmative defense and it is clear from *the face of the complaint* . . . that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (emphasis added) (internal quotation marks and citations omitted). Therefore, regardless of whether section 6084 is a statute of repose or a statute of limitations, we must decide the time-bar question by looking to the allegations of the operative complaints, taken as true and construed in the light most favorable to the plaintiffs. We proceed to do just that.

once "the plaintiff can file suit and obtain relief," *id.* at 504–05 (citation omitted), and may be tolled "as a matter of fairness" where the plaintiff "pursu[ed] [his or her] rights diligently" but was thwarted from "bringing a lawsuit" by "some extraordinary circumstance," *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 801 (2d Cir. 2014) (internal quotation marks and citation omitted).

By contrast, statutes of repose protect a *defendant*'s right, granted by the legislature, to "be free from liability after [a] legislatively determined period of time." *Waldburger*, 573 U.S. at 9 (internal quotation marks and citation omitted). Consistent with that purpose, "statutes of repose begin to run on the date of the last culpable act or omission of the defendant," *ANZ Sec.*, 582 U.S. at 505 (internal quotation marks and citation omitted), "extinguish[] a plaintiff's cause of action after the passage of [that] fixed period of time," *IndyMac*, 721 F.3d at 106 (emphasis and citation omitted), and cannot be extended by a court absent a basis in the statute.

The district courts here held that section 6084 is a statute of repose and was not legislatively tolled. On appeal, the plaintiffs challenge those conclusions by arguing that (1) section 6084 is a statute of limitations and therefore subject to equitable tolling; (2) even if section 6084 is a statute of repose, the time bar was

*legislatively* tolled by the Act's consistent suspension pursuant to Presidential decrees from 1996 to 2019, *see* 22 U.S.C. § 6085(c); and (3) even if no tolling is available, the plaintiffs' alleged timely conduct suffices to state a claim. We disagree with all three assertions.

B.     Analysis

1.     *Section 6084 is a statute of repose.*

"As with any question of statutory interpretation, we begin with the text of the statute." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (citation omitted). Taking this familiar approach, the Supreme Court in *ANZ Securities* concluded that the three-year time bar of section 13 of the Securities Act of 1933, 15 U.S.C. § 77m, is a statute of repose because the statute (1) in unambiguous language, "r[an] from the defendant's last culpable act"; (2) "admit[ted] of no exception and on its face create[d] a fixed bar against future liability"; and (3) was paired with a one-year time bar that ran from the moment the claim accrued, a common marker of a statute of limitations. 582 U.S. at 505–06.

*ANZ Securities*'s reasoning compels us to conclude that section 6084, too, is a statute of repose. First, its text states that "[a]n action . . . may not be brought more than 2 years after *the trafficking giving rise to the action has ceased to occur*." 22

U.S.C. § 6084 (emphasis added). The statutory phrase "has ceased to occur"

plainly cuts off liability two years after the defendant's last culpable act—not

when a claim accrues or has been discovered. *Id.* Such language is "close to a

dispositive indication that the statute is one of repose." *ANZ Secs.*, 582 U.S. at

505.[13] Indeed, the plaintiffs in their own brief concede that "Congress[] deci[ded]

to start the clock with the last culpable act."[14] Appellants' Br. at 52.

---

[13] The plaintiffs point to *Short v. Belleville Shoe Manufacturing Co.*'s observation that 15 U.S.C. § 78t-1, which runs from the "date of the last transaction that is the subject of the violation," is a statute of limitations and could thus be equitably tolled. 908 F.2d 1385, 1390 (7th Cir. 1990) (quoting section 78t-1). But that case, in which the court never analyzes section 78t-1's text, has been superseded by *ANZ Securities*. *See also N. Sound Cap. LLC v. Merck & Co. Inc.*, 702 F. App'x 75, 80–81 (3d Cir. 2017) (reversing because section 78t-1 contained a "statute[] of repose" and "*ANZ* made clear that . . . equitable tolling that does not apply to the federal securities laws' statutes of repose" (internal quotation marks and citation omitted)).

[14] The plaintiffs assert that section 6084 is nonetheless a statute of limitations because section 6023(13)(A), which defines "traffic[king]," prohibits "conduct that is continuing in nature— including, as here, 'participat[ing] in' and 'profit[ing] from' trafficking 'through another person,' and 'engag[ing] in a commercial activity' that 'uses' or 'benefits' from confiscated property." Appellants' Br. at 52 (quoting 22 U.S.C. § 6023(13)(A)). According to the plaintiffs, in prohibiting continuing conduct, Congress incorporated and codified the continuing-violations doctrine into the Helms-Burton Act. *See id.* at 52–53 ("Congress's decision to start the clock with the last culpable act . . . is best understood here as a means of incorporating the rule that a claim does not accrue while a continuing violation persists." (footnote omitted)). And because the continuing-violations doctrine is an equitable tolling doctrine, the plaintiffs argue that the time bar in section 6084 must be a statute of limitations.

This argument is unpersuasive for at least three independent reasons. First, it is extratextual and therefore cannot overcome section 6084's clear text. Second, all of the plaintiffs' cited authorities *first* established (or took as a given) that the time bar at issue was a statute of limitations and *then* relied on the continuing-violations doctrine as an equitable basis for tolling the limitations period. Third, whether the unlawful conduct is continuous is not a basis upon which we can decide whether a time bar is a statute of limitations or repose. If the time bar

Second, the statutory phrase "[a]n action . . . may not be brought," 22

U.S.C. § 6084, "admits of no exception," *ANZ Secs.*, 582 U.S. at 505.  The plaintiffs

object that *ANZ Securities* is inapplicable here because it dealt with section 77m's

far more emphatic language—"in no event shall any . . . action be brought."  15

U.S.C. § 77m.  But "[t]he phrase 'in no event' simply means 'may not.'"  *Abdul-*

*Akbar v. McKelvie*, 239 F.3d 307, 313 (3d Cir. 2001) (*en banc*) (interpreting the

phrase "in no event shall a prisoner bring a civil action or appeal [certain

judgments]" in 28 U.S.C. § 1915(g)).  Nor is there any difference, in this context,

between section 77m's operative phrase "shall not" and section 6084's operative

phrase "may not."  "[S]hall not means . . . may not" because "shall not denies

permission (*i.e.*, it means 'may not')."  *Young Conservatives of Tex. Found. v.*

*Smatresk*, 73 F.4th 304, 312 (5th Cir. 2023) (quoting *Words of Authority*, Bryan A.

Garner, Garner's Dictionary of Legal Usage (3d ed. 2011)).  Nor is it out of the

ordinary to interpret a statutory time bar containing the operative phrase "may

not" as a statute of repose.  Both the Supreme Court and this Court have done so.

*See Waldburger*, 573 U.S. at 13 (describing 15 U.S.C. § 78u-6(h)(1)(B)(iii)(I)(aa) as a

---

begins to run from the moment the unlawful conduct—continuous in nature or not—ceases, it suggests the time bar is a statute of repose.  If the time bar begins to run from the moment the unlawful conduct—again, continuous or not—is sufficient to accrue into a plaintiff's claim, it suggests the time bar is a statute of limitations.

31

"statute of repose," where time bar provision stated that "[a]n action under this subsection *may not be brought* more than 6 years after the date on which the violation . . . [has] occurred" (emphasis added)); *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 104 (2d Cir. 2004) (describing section 804(a) of the Sarbanes Oxley Act as a "statute of repose," the operative phrase of which amended 28 U.S.C. § 1658(b)(2) to state that an action "*may be brought not later than* . . . 5 years after [the] violation" (emphasis added)).

Third, and contrary to the plaintiffs' assertions, the fact that section 6084, unlike section 77m, omits a second time bar running from a claim's date of accrual, *cf. ANZ Secs.*, 582 U.S. at 505, does not compel us to find that the statute is one of limitations. *ANZ Securities* did not regard the presence or absence of a second time bar as dispositive. And where, as here, the time bar runs from the defendant's last culpable act, and its mandatory language admits of no exception, the lack of a parallel time bar cannot overcome the conclusion that the statute is one of repose. *See id.* at 506 (determining that running from the last culpable act and creating, on the face of the statute, a fixed bar against future liability established that section 77m is a statute of repose, and "[t]his view is *confirmed* by the [statute's] two-sentence structure[.]" (emphasis added)).

32

Consistent with *ANZ Securities*, we therefore conclude that section 6084, by its plain text, is a statute of repose not subject to equitable tolling by a court.

In resisting that conclusion, the plaintiffs contend that interpreting section 6084 as a statute of repose conflicts with the Act's stated goal of "deter[ring] trafficking in wrongfully confiscated property" by "endow[ing]" claimants "with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." Appellants' Br. at 54 (quoting 22 U.S.C. § 6081(11)); *see also id.* § 6022(6) (describing, among other purposes of the Act, the "protect[ion of] United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime"). But this is not the Act's only purpose. It also expressly contemplates, as additional purposes, "strengthen[ing] international sanctions against the Castro government" and supporting "a democratically elected government in Cuba," *id.* § 6022(1)–(5)—aims advanced by deterring foreign companies from doing business in, or trafficking in property confiscated by, Cuba.

The Act's statutory scheme, even while contemplating both sets of purposes, gives precedence to regime change over the compensation of victims.

For example, Title III included a three-month grace period from its effective date within which companies could stop trafficking and thus avoid liability, even if they previously engaged in and benefited from trafficking. *See id.* § 6082(a)(1)(A). Similarly, as discussed in greater detail below, the Act provides that a presidential determination that a "democratically elected government in Cuba is in power" will permanently extinguish the right to bring Title III actions, *id.* § 6082(h)(1)(B), regardless of whether putative plaintiffs have received compensation for their confiscated property or putative defendants have trafficked and would continue to traffic in that property. Reading section 6084 as a statute of repose thus advances the purpose of the statute: incentivizing traffickers to stop investing in Cuba by guaranteeing an end of liability two years after they cease their trafficking activities.

Thus, we conclude that section 6084 is a statute of repose, and any extension of the two-year time bar must therefore be pursuant to a legislative exception written into the statute by Congress itself. As we discuss next, no such exception exists here.

2.      *Sections 6085(c)(1), (2), and (d) do not create a legislative exception to section 6084.*

The plaintiffs argue that, even if section 6084 is a statute of repose, their lawsuits were timely because their time bar was legislatively tolled.  Under subsections 6085(c)(1) and (2), every President from the passage of the Helms-Burton Act in 1996 through May 2019 continually suspended the private right of action.  These suspensions, the plaintiffs maintain, extended the deadline by which they had to file the instant actions.

*Text*.  According to sections 6085(c)(1)(B) and (c)(2), "the President may suspend the right to bring an action" for six months at a time if the President (i) determines that the "suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba," and (ii) reports that determination to the appropriate congressional committee at least fifteen days before the suspension is to take effect.  22 U.S.C. § 6085(c)(1)(B); *id.* § 6085(c)(2).  Section 6085(d) states that "[t]he President may rescind any suspension."  *Id.* § 6085(d).

The ordinary meaning of "suspend," the plaintiffs argue, is "[t]o *temporarily* keep (a person) from . . . exercising a right," or to "interrupt; postpone; defer."  Appellants' Br. at 56 (alteration in original) (quoting *Suspend*,

*Black's Law Dictionary* (11th ed. 2019)). To "rescind" is to "put an end to [the matter] as though it never were," and thereby wind back the clock to the status quo *ex ante* any suspension. *Id.* (quoting *In re Trusteeship Created by JER CRE CDO 2005-1, Ltd.*, No. 13-cv-2239 (JSR), 2013 WL 6916912, at *4 (S.D.N.Y. Dec. 31, 2013) (quoting *Rescission of Contract*, *Black's Law Dictionary* (6th ed. 1990))). Therefore, the plaintiffs argue, sections 6085(c)(1)–(2) and (d) not only define the President's power to suspend the right to file suit as defined in section 6082. They also toll the time limit as to when an action must be brought any time a suspension is in place, as was continuously the case from 1996 through May 2019.

We disagree. True, sections 6085(c)(1), (2), and (d) spell out conditions under which the President may limit a *plaintiff's* right to bring an action. But section 6084, as a statute of repose, protects a "*defendant*[*'s* right to] be free from liability after the legislatively determined period of time." *Waldburger*, 573 U.S. at 9 (citations omitted). As to that right, sections 6085(c)(1), (2), and (d) are silent. Because "absent [statutory] provisions cannot be supplied by the courts," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (alterations adopted and citation omitted), we will not infer that sections

36

6085(c)(1), (2), and (d), limiting a plaintiff's right to bring an action under section 6082, were also intended to affect the defendant's right to repose, set out in the separate section 6084, two years after ceasing its unlawful conduct. *See also Iselin v. United States*, 270 U.S. 245, 251 (1926) ("To supply omissions transcends the judicial function."). Where the applicable time bar is a statute of repose, statutorily suspending a plaintiff's right to bring an action for a period of time does not, without more, extend the plaintiff's deadline by which to bring suit.

We understand that this interpretation cuts off the plaintiffs' right to bring a Helms-Burton action before they ever had the ability to do so. But this result is entirely consistent with how statutes of repose are, at least in most situations, supposed to operate. Statutes of repose usually run without tolling "even in cases of extraordinary circumstances beyond a plaintiff's control." *Waldburger*, 573 U.S. at 9. For example, we have observed that "a statute of repose may bar a claim even before the plaintiff suffers injury, leaving her without any remedy." *Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 140 (2d Cir. 2013); *see also P. Stolz*, 355 F.3d at 103 ("[A] repose period can run to completion even before injury has occurred to a potential plaintiff, extinguishing a cause of action before it even accrues."). In short, "statutes of repose show [n]o [m]ercy to plaintiffs."

*Fedance v. Harris*, 1 F.4th 1278, 1284 (11th Cir. 2021) (internal quotation marks omitted). We have concluded above that section 6084 is such a "merciless" statute of repose.[15] A presidential suspension of the right to bring an action under the Act therefore does not toll the time bar.

*Structure.* The plaintiffs next contend that the "structure" of the Helms-Burton Act supports the conclusion that sections 6085(c)(1), (2), and (d) operate as a legislative exception to section 6084's time bar. Appellants' Br. at 56. We find this argument also to be unconvincing.

The plaintiffs contrast Congress's use of "suspend" and "rescind" in sections 6085(c)(1), (2), and (d) with its use of "cease" in section 6082(h)(1)(B). Section 6082(h)(1)(B) states: "All rights created under this section to bring an action for money damages . . . shall *cease*" once the President has determined

---

[15] The plaintiffs' citation to *Artis v. District of Columbia* for the proposition that the Supreme Court's "decisions employ the terms 'toll' and 'suspend' interchangeably," 583 U.S. 71, 81 (2018), is inapposite. To begin, the meaning of certain words used by the Supreme Court in its opinions is a different question from the plain meaning of those words used by Congress in a statute. In any event, *Artis* and the decisions cited therein are inapplicable because they analyzed statutes of limitations. *See id.* at 80–81. Because statutes of limitations begin to run from the accrual of a claim, it is sensible to interchangeably speak of "suspending" (a claim) and "tolling" (a time bar) because the claim and time bar are keyed to each other. By contrast, these terms carry different meaning when used in the context of a statute of repose, in which "suspension" affects a plaintiff's right to bring an action, and "tolling" affects a defendant's distinct right "to be free from liability after a legislatively-determined period of time." *IndyMac MBS*, 721 F.3d at 106.

"that a democratically elected government in Cuba is in power." 22 U.S.C.

§ 6082(h)(1)(B) (emphasis added). "[C]ease," the plaintiffs argue, plainly means

that the right to bring an action terminates entirely. "[S]uspend" in sections

6085(c)(1) and (2) therefore cannot mean that the right to bring an action is

extinguished forever because "[w]hen Congress uses certain language in one part

of the statute and different language in another, we assume different meanings

were intended." *Everytown for Gun Safety Support Fund v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 984 F.3d 30, 44 (2d Cir. 2020) (internal quotation

marks and citation omitted, alterations adopted).

Again, we disagree. Section 6082(h)(1)(B) defines what consequence *must*

result if the President determines that Cuba has transitioned to a democratic

government. Sections 6085(c)(1) and (2), by contrast, define a power the

President *may* exercise if Cuba has not yet transitioned to a democratic

government. There is no tension between mandatorily and permanently

extinguishing the right for *any* plaintiff to bring suit under one set of

circumstances, *see* 22 U.S.C. § 6082(h)(1)(B), and discretionarily and temporarily

suspending that right under a different set of circumstances, with the incidental

effect of extinguishing the right for some plaintiffs if the suspension is repeated

often enough, *see id.* § 6085(c)(2). Moreover, section 6082(h)(1)(B) requires the erasure of the private right of action regardless of whether any unlawful trafficking targeted by the Act has stopped. Not so for suspensions under sections 6085(c)(1) and (2), which may implicate section 6084's cutoff of liability for a potential defendant only if that defendant has stopped trafficking.

***Post-Enactment Executive Commentary***. Finally, and equally unavailing, is the plaintiffs' argument that certain statements made by President Bill Clinton and executive branch officials compel the conclusion that Presidential suspensions under Section 6085(c) legislatively tolled their right to bring a cause of action. The plaintiffs rely on, for example, a statement issued by President Clinton on July 16, 1996, in which he explained that he would permit Title III to take effect, while simultaneously exercising his authority to suspend the private right of action for six months. *See* The White House Office of Communications, *President Statement On Helms-Burton Waiver Exercise*, 1996 WL 396122, at *1–2 (July 16, 1996). With the Act thus "in effect, liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted." *Id.* at *2. The plaintiffs argue that, if

liability attaches "irreversibly" during the first suspension period, it cannot expire after additional such suspensions.

This commentary from the executive branch—*after* the enactment of the Act in March 1996—cannot alter the plain meaning of the statute. *See, e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (concluding that interpretation of statute "beg[an] and end[ed]" with unambiguous text of the statute and rejecting argument that "legislative history point[ed] to a different result"). But even if we were to take the President's statement to be binding, the plaintiffs' argument would still fail. The statement explains that "allow[ing] Title III to come into force" put "all companies doing business in Cuba . . . on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States." *President Statement*, 1996 WL 396122, at *1. This prospective liability was to "serve as a deterrent to such trafficking—one of the central goals of the . . . Act." *Id.* The six-month suspension, in turn, was to serve as a grace period during which President Clinton's "Administration [would] build support from the international community . . . to promote democracy in Cuba." *Id.* During that period, "foreign

companies [would] have a strong incentive to immediately cease trafficking in expropriated property—the only sure way to avoid future lawsuits." *Id.* at *2.

The plaintiffs' understanding that Presidential suspensions tolled the statute of repose would remove that incentive and undercut the very purpose of the Act. As the district court in the *Pujol* Actions correctly reasoned, "traffickers would have little incentive to cease trafficking any time during a suspension" if they were to "continue to face liability for an additional two years after a suspension [is] lifted, without regard for when they ceased trafficking." Spec. App'x at 18. Far from being encouraged to stop, traffickers "would be incentivized to continue trafficking until the day the suspension was lifted" to maximize profits in the face of near-certain liability. *Id.*

In sum, we conclude that section 6085(c) does not create a legislative exception to the Act's statute of repose. This result flows from the unambiguous text of sections 6085(c) and (d), and is further bolstered by the structure and purpose of the Act. Like the district courts, we see no basis on which to conclude that the plaintiffs' time bar was tolled.

\* \* \*

We conclude that section 6084 is a statute of repose and was not legislatively tolled. We therefore affirm both district courts' holdings that the plaintiffs' allegations of all conduct before 2017 and 2018 are time-barred.

### III.  Plausibility of the Plaintiffs' Allegations

Of course, our conclusion that section 6084 is a statute of repose that was not legislatively suspended does not, in itself, preclude the plaintiffs from stating a Title III claim. Although SocGen's and Paribas's conduct between 2000 and 2010, standing alone, falls far outside the repose period and therefore cannot support a cause of action, the plaintiffs nevertheless contend their claims are timely because they plausibly allege that SocGen's and Paribas's trafficking activities, including those in which they had engaged through 2010, had not "ceased to occur" but in fact continued well into the repose period. As explained below, we are not persuaded.

A.  <u>Legal Framework</u>

We review *de novo* whether the plaintiffs' allegations state a plausible section 6082 claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). In doing so, we "accept well

43

pleaded factual assertions as true" and "draw all reasonable factual inferences in favor of the plaintiff[s]." *Id.* at 76.

As noted above, section 6082(a)(1)(A) authorizes a cause of action against "any person that . . . traffics" in property confiscated by the Cuban government on or after January 1, 1959. 22 U.S.C. § 6082(a)(1)(A). The Act's definition of "trafficking" sweeps broadly. It covers "any person" who (i) "sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property," 22 U.S.C. § 6023(13)(A)(i); (ii) "engages in a *commercial activity using or otherwise benefiting from* confiscated property," *id.* § 6023(13)(A)(ii) (emphasis added); or (iii) "causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) *by another person*, or otherwise engages in trafficking (as described in clause (i) or (ii)) *through another person*," *id.* § 6023(13)(A)(iii) (emphasis added).

B.        Analysis

To plead a claim that meets this statutory definition, the plaintiffs offer

three sets of allegations.  They are, both individually and in the aggregate,

insufficient.

*First*, the plaintiffs point to the more specific factual allegations regarding

SocGen's conduct through 2010—to which SocGen admitted in its deferred-

prosecution agreement—and attempt to revive them with general allegations

that SocGen continued to engage in those activities into 2019 and 2020.   In

particular, the plaintiffs allege that they received information from a SocGen

employee who had been "responsible for managing sovereign risk, and

previously helped create SocGen's 'Cover Procedures,' which were used to

conceal U.S. dollar-denominated transactions with BNC."  *Pujol* SAC ¶ 40;

*Sucesores* TAC ¶ 46.  According to that "whistleblower," SocGen continued to

profit from "providing Cuban entities access to foreign currency" until at least

September 2019 and to provide "access to U.S. dollars and other foreign currency

that Cuba and . . . []BNC[] could not themselves access or provide to BNC's

clients."  *Pujol* SAC ¶¶ 40, 42; *Sucesores* TAC ¶¶ 46, 48.  These transactions

included the continued provision of credit facilities to Cuban entities "except

[that the new] facilities exclude[d] U.S.-dollar transactions to avoid U.S. law."

*Pujol* SAC ¶ 63; *Sucesores* TAC ¶ 67.  The complaint makes clear that all of these allegations are made "upon information and belief," and the only basis for that belief is the assertion that BNC is the "primary financial institution with whom foreign companies do business in or with Cuba."  *Pujol* SAC ¶ 40; *Sucesores* TAC ¶ 46.

These allegations purporting to connect SocGen's transactions with BNC are conclusory and not well-pleaded.  To begin, the plaintiffs fail to allege that, after 2010, SocGen continued or renewed the credit facilities they had extended to BNC, as opposed to other Cuban entities with which they had transacted business.  Indeed, the operative complaints are entirely silent as to any specific commercial activities that SocGen engaged in with Cuban entities after 2010.

Instead, the plaintiffs rely entirely on "information and belief" pleading to link SocGen's "ongoing" conduct to BNC.  But "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."  *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).  Rather, pleading based on information and belief "will only make otherwise unsupported claims plausible when [1] the facts are peculiarly within the possession and control of the defendant or [2] where the belief is based on

factual information that makes the inference of culpability plausible." *Id.* at 384–85 (internal quotation marks and citation omitted). Here, the fact that the plaintiffs have access to a SocGen employee familiar with SocGen's prior dealings with BNC necessarily means that the facts are *not* peculiarly in SocGen's possession. In other words, the plaintiffs either did have some way of knowing whether SocGen transactions flowed through BNC, or at the very least, failed to explain why their whistleblower did not have that information.

In short, the plaintiffs seek an inference that SocGen transacted business with BNC (and thus unlawfully "traffic[ked]" in "confiscated property") without providing any factual information that lends plausibility to that inference. The mere allegation that SocGen "provid[ed] Cuban entities access to foreign currency" does not mean that such funds flowed through a Cuban bank, or that if it did, that bank must have been BNC. *Pujol* SAC ¶ 40; *Sucesores* TAC ¶ 46. Indeed, the plaintiffs themselves allege that BNC is the "primary"—and hence not the *only*—"financial institution with whom foreign companies do business in or with Cuba." *Pujol* SAC ¶ 40; *see also id.* ¶¶ 20, 42 (all referring to BNC as the "primary" financial institution in Cuba). At most, the operative complaints only generally allege that Paribas continues to do business with Cuban entities—not

47

that SocGen continued to transact with BNC after 2010. Such allegations do not give rise to a timely claim for trafficking.[16]

*Second*, the plaintiffs allege that, according to a Paribas compliance officer, the bank transacted business with a German company, a French company, and Melbana Energy through at least early 2020, and with the Cuban investment firm RaFin, S.A. through at least December 2018. *Pujol* SAC ¶ 56; *Sucesores* TAC ¶ 62. Again relying solely "[u]pon information and belief," the plaintiffs assert that "BNC [was] involved in at least some of the transactions because it is the primary financial institution with whom foreign companies do business in or with Cuba." *Pujol* SAC ¶ 56. As noted above, this "information and belief" pleading falls short because (1) the necessary facts are apparently *not* peculiarly in Paribas's possession, given the plaintiffs' access to at least one compliance officer within Paribas, and (2) the link between BNC and Paribas depends entirely on the plaintiffs' allegation that BNC is the "primary" financial institution involved in foreign businesses' dealings with Cuba. Accordingly, there is no plausible basis

---

[16] In a related attempt to suggest that the commercial activities with BNC and Cuban entities to which Paribas admitted in its guilty plea continued beyond 2010, the plaintiffs allege generally that Paribas "converted a number of the remaining credit facilities into Euro-denominated credit facilities." *Pujol* SAC ¶ 48; *Sucesores* TAC ¶ 54. But these allegations are plainly insufficient: the plaintiffs say nothing about which credit facilities were converted, let alone whether they involved BNC, or whether those facilities continued into the repose period (or ceased to exist at an earlier time).

for the allegation that BNC *must* have been involved in some of the transactions between Paribas and the foreign third parties that allegedly interacted with Cuban entities.

*Third*, and perhaps most concretely, the plaintiffs allege that, in 2020, "Paribas routinely provide[d] to BNC in Switzerland parcels of U.S. currency." *Pujol* SAC ¶ 49; *Sucesores* TAC ¶ 55. The plaintiffs maintain that, through those deliveries of cash, BNC "continue[d] to access international markets and conduct transactions . . . that it would not otherwise be able to access or conduct." *Pujol* SAC ¶ 49; *Sucesores* TAC ¶ 55. But notwithstanding the Act's capacious definition of "trafficking," this allegation does not plausibly state such a claim. To begin, nowhere do the plaintiffs allege that the cash itself was "confiscated property." Absent such an allegation, Paribas could not have "s[old], transfer[red], distribute[d], dispense[d], broker[ed], manage[d], or otherwise dispose[d] of *confiscated property*, or purchase[d], lease[d], receive[d], possesse[d], obtain[ed] control of, manage[d], use[d], or otherwise acquire[d] or h[eld] an interest" therein, as required by subclause (i) of 22 U.S.C. § 6023(13)(A) (emphasis added). Nor do the plaintiffs satisfy subclause (ii) or (iii) of the statute. As the district court in the *Pujol* Actions observed, the plaintiffs do not

allege "what, if anything, BNC did with the currency and whether BNC gave anything to Paribas in exchange for it." Spec. App'x at 35. In other words, we do not know if BNC brought any confiscated property into its transactions with Paribas in response to the cash deliveries. Absent any additional factual context, we therefore cannot reasonably infer that, by delivering those parcels to BNC, Paribas "engage[d] in a commercial activity using or otherwise benefiting from confiscated property," *id.* § 6023(13)(A)(ii), or "cause[d], direct[ed], participate[d] in, or profit[ed] from, trafficking (as described in clause (i) or (ii)) by [BNC], or otherwise engage[d] in trafficking (as described in clause (i) or (ii)) through [BNC]," *id.* § 6023(13)(A)(iii). We therefore affirm as to both district courts' decisions that the parcel-of-cash allegation does not give rise to any trafficking claim.[17]

---

[17] Paribas alternatively argues that, as Judge Vyskocil concluded, the exercise of personal jurisdiction over Paribas as to the cash-parcel allegation would be improper under both New York's long-arm statute and constitutional due process. We need not resolve this issue. *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) ("We may affirm on any ground with support in the record, including grounds upon which the district court did not rely." (internal quotation marks and citation omitted)). While it is true that "we traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013) (citation omitted). Proceeding to the merits of a claim "is particularly appropriate" on review of a Rule 12(b)(6) motion to dismiss "where, as here, the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development." *Id.* (internal quotation marks and citation omitted).

In sum, none of the plaintiffs' allegations plausibly state a timely claim of unlawful trafficking under section 6082(a)(1)(A) of the Helms-Burton Act.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit.  For the reasons explained above, we AFFIRM the district courts' orders and judgments dismissing the *Pujol* and *Sucesores* Actions.